UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SELECTIVE INSURANCE COMPANY | ) | |
| OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:14-CV-531-TAV-CCS |
| | ) | |
| ENVIRONMENTAL, SAFETY & HEALTH, INC., | ) | |
| WILLIAM GARIBAY, GO FISH LLC, and | ) | |
| FIRST TENNESSEE BANK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This civil matter is before the Court on plaintiff Selective Insurance Company of America's ("Selective") Motion for Preliminary Injunction for Deposit of Collateral, Deposit of Proceeds of Bonded Contracts into Trust Account, and Access to Books and Records [Doc. 12], which was filed against defendants Environmental, Safety & Health, Inc. ("ESH"), William Garibay ("Garibay"), and Go Fish LLC ("Go Fish") (ESH, Garibay, and Go Fish, collectively, the "Indemnitors"). The Indemnitors did not file a response to the motion for injunctive relief, but together with plaintiff, submitted a proposed agreed order resolving the motion.[1] The other defendant in this action, First Tennessee Bank ("First Tennessee"), filed a response in opposition to the motion for injunctive relief [Doc. 19], and indicated its objection to the proposed order, asserting

---

[1] While Selective states it attached this proposed agreed order as an exhibit to its reply to First Tennessee's response to the motion for injunctive relief, no such exhibit exists [*See* Doc. 27 ¶ 10].

that the requested relief interferes with the bank's collateral rights. In connection with that response, First Tennessee also filed a motion to dismiss the claims against it [Doc. 13]. For the reasons explained below, and after careful consideration of the filings and relevant law, the Court will deny the motion to dismiss and grant the motion for injunctive relief.

I.     **Background**

ESH has been engaged in the construction contracting business and was required to provide surety bonds in connection with its construction contracts [Doc. 7 ¶ 10]. On or about September 17, 2012, in consideration for, and in order to induce Selective to issue bonds on behalf of ESH, ESH, as principal, and Garibay, as indemnitor, executed a General Agreement of Indemnity in favor of Selective as surety (the "GAI") [*Id.* ¶ 11]. On or about June 13, 2013, Go Fish executed an Addendum to General Agreement of Indemnity Adding an Indemnitor, whereby Go Fish agreed to be bound to Selective in all respects as if Go Fish had signed the GAI (the "Addendum") [*Id.* ¶ 12].

According to Selective, by executing the Indemnity Agreement, the Indemnitors jointly and severally agreed to (1) provide Selective collateral equal in value to Selective's reserve, (2) deposit the proceeds of bonded contracts into a trust account designated/administered by Selective, and (3) provide Selective continuous/uninterrupted access to their books, records, accounts, and other information related to any bond and/or the Indemnitors' financial condition, credit worthiness, and assets [*Id.* ¶¶ 17, 23, 24].

2

And the Indemnitors acknowledged that Selective may obtain injunctive relief compelling them to deposit collateral with Selective [*Id.* ¶ 18].

In addition, Selective asserts that the GAI imposes a number of other obligations upon the Indemnitors. For example, paragraph 3 of the GAI jointly and severally obligates the Indemnitors to "exonerate, indemnify and save harmless [Selective] . . . from and against any and all liability, loss, cost, damage and expense of whatsoever kind or nature" (including attorneys' fees) that Selective may sustain:

> (1) by reason of having executed any Bond or other instrument or any renewal, modification, continuation, substitution or extension thereof,
>
> (2) by reason of the failure of any one or more of the Indemnitors to perform or comply with the promises, covenants and conditions of [the indemnity] Agreement or,
>
> (3) in enforcing any of the promises, covenants or conditions of [the indemnity] Agreement.

[Doc. 12-2 ¶ 2 ex. 1]. Paragraph 3 also clarifies that the Indemnitors' indemnity obligations extend to any payment Selective makes under the belief that "(1) [Selective] was or might be liable therefore or (2) the payments were necessary or advisable to protect any of [Selective]'s rights or to avoid or lessen [Selective]'s liability or alleged liability" [*Id.*].

3

In reliance upon the Indemnitors' execution of the GAI, Selective issued the following bonds on behalf of ESH (the "bonds"):

| Issue Date | Bond Description | Penal Sum | Obligee | Project |
|---|---|---|---|---|
| September 24, 2013 | Contract Payment and Performance Bond No. B1135318 | $639,431.41 | Tennessee Department of Transportation | TDOT Contract No. CNM934 |
| October 25, 2013 | Performance Bond No. B1137437 | $903,030 | Army Corps of Engineers | Nashville District Intake Head Gate Repair Center Hill Dam |
| October 29, 2013 | Contract Bond No. B1136977 | $1,168,580 | Tennessee Department of General Services | Campground Upgrades, Panther Creek State Park, Morristown, Hamblen County, Tennessee |
| December 27, 2013 | Payment Bond No. B113890 | $233,293 | Lenoir City Utility Board | C Street Water Line Relocation Project, Lenoir City, Tennessee |

[Doc. 12-2 ¶ 4]. Selective alleges that the Indemnitors have (a) failed to pay subcontractor/suppliers relative to the contracts covered by the bonds (collectively, the "bonded contracts"), (b) failed to exonerate, indemnify and save Selective harmless relative to the bonds and/or the bonded contracts, (c) failed to deposit any collateral with Selective, and (d) failed to provide Selective meaningful access to their books, records, accounts, etc., each of which constitutes a material breach of the GAI [*Id.* ¶ 5]. And in

4

further breach, Selective avers that ESH has been instructing its subcontractors/suppliers to seek payment from Selective under the bonds [*Id.*].

Upon information and belief, Selective alleges that the Indemnitors have also used proceeds of the bonded contracts for purposes other than satisfaction of the conditions of the bonds. Particularly, Selective asserts that First Tennessee has accepted and/or directed ESH to use proceeds of the bonded contracts to pay debts purportedly owed to First Tennessee with knowledge that ESH held those funds in trust [*See* Doc. 7 ¶¶ 37–39, 48–49, 56–57, 65–66].

## II. First Tennessee's Motion to Dismiss [Doc. 13]

Selective asserts that First Tennessee is liable for conversion because First Tennessee wrongfully exercised its purported setoff rights against the bonded contract proceeds in ESH's account with First Tennessee and/or wrongfully applied those funds to debts purportedly owed to First Tennessee with knowledge that ESH held those funds in trust for the benefit of Selective and ESH's subcontractors and suppliers on bonded projects and/or that those funds were deposited for the statutorily/contractually mandated payment of ESH's subcontractors and suppliers on bonded projects [Doc. 7 ¶¶ 121–129; Doc. 26 p. 1]. First Tennessee counters that Selective has failed to state a claim for conversion because the bonded contract proceeds are not, in fact, trust funds, and even if they are trust funds, First Tennessee had the right to setoff [*See* Docs. 14, 27].

5

### A. Motion to Dismiss Standard of Review

Federal Rule of Civil Procedure 8(a)(2) sets out a liberal pleading standard, *Smith v. City of Salem*, 378 F.3d 566, 576 n.1 (6th Cir. 2004), requiring only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the [opposing party] fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do," neither will "'naked assertion[s]' devoid of 'further factual enhancement[,]'" nor "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557).

In deciding a Rule 12(b)(6) motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, draw all reasonable inferences in favor of the plaintiff, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a

plausible claim for relief will [ultimately] . . . be a context-specific task that requires th[is Court] to draw on its judicial experience and common sense." *Id.* at 679.

## B. Conversion Claim

"[C]onversion 'is the appropriation of another's property to one's own use and benefit, by the exercise of dominion over the property, in defiance of the owner's right to the property.'" *VRF Eye Specialty Grp., PLC v. Yoser*, 765 F. Supp. 2d 1023, 1032 (W.D. Tenn. 2011) (quoting *Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009)). Conversion is an intentional tort, and a party seeking to make out a *prima facie* case of conversion must prove the following: (1) the appropriation of another's property to one's own use and benefit; (2) by the intentional exercise of dominion over it; (3) in defiance of the true owner's rights. *Royal v. Select Portfolio Servicing, Inc.*, No. 11-2214-STA-dkv, 2012 WL 174950, at *5 (W.D. Tenn. Jan. 20, 2012) (citations omitted).

First Tennessee takes issue only with the last element required to state a claim for conversion; that is, defying the true owner's rights. It asserts that "unless Selective's allegations establish that Selective was the 'true owner' of the funds at issue with an immediate and superior right of possession at the time of First Tennessee's exercise of dominion over the funds, then First Tennessee's actions as a secured creditor were authorized by law under its consensual lien on ESH's accounts . . . ." [Doc. 14 p. 8]. Put another way, First Tennessee argues that, "unless Selective can establish that its trust fund theory is effective as against First Tennessee . . . , then First Tennessee's actions

7

were valid, authorized and lawful" and thus not in defiance of the true owner's rights [*Id.* at 9].

Accordingly, the primary issue for the Court to address in determining whether Selective has stated a claim for conversion is whether the allegations of the complaint support the existence of a trust. Selective asserts various theories in its complaint for the existence of a trust, including the terms of the GAI and provisions of federal and state law. The Court begins and ends with the terms of the GAI because it finds that the GAI creates an express trust under Tennessee law.[2]

Under Tennessee law, there are three elements for establishing the existence of an express trust: "(1) a trustee who holds trust property and who is subject to the equitable duties to deal with it for the benefit of another, (2) a beneficiary to whom the trustee owes the equitable duties to deal with the trust property for his benefit, and (3) identifiable trust property." *Kopsombut-Myint Buddhist Ctr. v. State Bd. of Equalization*, 728 S.W.2d 327, 333 (Tenn. Ct. App. 1986) (citation omitted); *see also* Tenn. Code Ann. §§ 35-15-402(a), 35-15-106. "[A]t a minimum, there must be a grantor or settlor who intends to create a trust; a corpus (the subject property); a trustee; and a beneficiary." *Myers v. Myers*, 891 S.W.2d 216, 218 (Tenn. Ct. App. 1994) (emphasis omitted). "The trustee holds legal title and in that sense, owns the property, holding it for the benefit of the beneficiary who owns the equitable title." *Id.* "While the grantor may retain either of these interests, no

---

[2] For this reason, the Court declines to address the parties' arguments concerning other means though which a trust may have been impressed upon the proceeds of the bonded contract.

one may solely hold both as the purpose of separating the two would be defeated." *Id.* (citation omitted).

Pursuant to the unambiguous language of the GAI, ESH agreed to hold all bonded contract proceeds in trust for the benefit of Selective and ESH's subcontractors and suppliers and for the exclusive purpose of satisfying the conditions of the bonds:

> TRUST FUNDS. If any of the Bonds or other instruments are executed by Surety in connection with the performance of a contract, the entire contract price or other consideration to be received by an Indemnitor, whether received as payments or loans, shall be dedicated to the satisfaction of the conditions of the Bond(s) or other instrument(s). All consideration, including all funds paid, due or to become due and all securities, warrants, checks or other evidence of indebtedness and the proceeds thereof, given upon or under any contract in connection with which Surety shall have issued a Bond ("Trust Funds") shall be impressed with a trust in favor of and for the benefit of laborers, materialmen, suppliers, subcontractors and Surety for the exclusive purpose of satisfying the conditions of the Bonds. In the event of a default by any Indemnitor in the performance or compliance with any promise, covenant or obligation under this agreement, the Surety may demand and the Indemnitors shall cause all funds or the proceeds of all consideration received or to be received from any contract referred to in any Bond to be deposited into separate trust accounts with a bank or similar depository designated by Surety and such accounts shall be controlled by an escrow agent to be designated by Surety. . . .

[Doc. 7-1 ¶ 10].

The Court finds that this provision of the GAI satisfies all of the requirements for the creation of an express trust. First, ESH indicated its intention to create a trust by agreeing that "[a]ll consideration, including all funds paid, due or to become due and all securities, warrants, checks or other evidence of indebtedness and the proceeds thereof, given upon or under any contract in connection with which Surety shall have issued a

9

Bond" be impressed with a trust [*Id.*]. Second, ESH, as trustee, has certain duties, including dedicating the bonded contract proceeds for the exclusive purpose of satisfying the conditions of Selective's bonds (such as paying ESH's subcontractors and suppliers), and, upon demand, depositing the bonded contract proceeds into separate trust accounts [*Id.*]. Third, there are definite beneficiaries: Selective and ESH's subcontractors and suppliers [*Id.*]. Finally, there is identifiable trust property; that is, all funds paid, due, or to become due under the bonded contracts [*Id.*]. "[W]here a person has or accepts possession of personal property with the express or implied understanding that he is not to hold it as his own absolute property, but is to hold and apply it for certain specific purposes or for the benefit of certain specified persons, [as here,] a valid and enforceable express trust exists." *In re Elrod*, 42 B.R. 468, 473 (Bankr. E.D. Tenn. 1984) (citation omitted).

Both parties address *Acuity v. Planters Bank, Inc.*, 362 F. Supp. 2d 885 (W.D. Ky. 2005), a case with very similar facts to this case, asserting it supports their positions that the GAI does or does not create an express trust. The Court reads *Acuity* in line with Selective and concludes it supports the Court's finding that the GAI creates an express trust.

In *Acuity*, a contractor defaulted on its construction contract with the Commonwealth of Kentucky and its loan re-payment with a bank. 362 F. Supp. 2d at 887. The bank had set off contract funds from the contractor's account, and the contractor's surety claimed that it had a right to those funds. Like in this case, one theory

10

asserted by the surety was that the funds did not belong to the contractor because those funds were subject to a trust created by the indemnity agreement between the contractor and the surety. *Id.* at 891–93. That agreement provided:

> If any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, the Contractor and Indemnitors covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

*Id.* at 891.

Looking to Kentucky law, the court noted the elements for forming an express trust: "(1) an express intent to create a trust; (2) an ascertainable *res;* (3) a sufficiently certain beneficiary; and (4) a trustee who owns and administers the *res* for the benefit of another (the beneficiary)." *Id.* at 892 (citation omitted). While the court determined that the agreement demonstrated the contractor's intent to create a trust and that the beneficiaries were sufficiently certain, there was an "absence of coincidence between the existence of a trust *res* and a declaration of intent," which is a requirement of Kentucky law when the settlor and trustee are the same. *Id.* at 893; *see also id.* at 892 (noting that

11

the contractor, "as settlor and trustee must make some action to create a trust by declaration," and that "[t]o do so at some future time, unaccompanied by later action or evidence of intent to create a trust, is not enough" (citations omitted)). Yet, in Tennessee, there appears to be no similar requirement, and the trust can "arise when its subject matter does become definite or definitely ascertainable." *In re Appalachian Oil Co.*, 471 B.R. 199, 208 (Bankr. E.D. Tenn. 2012) (citation omitted); *see also Crews v. Overbey*, 645 S.W.2d 388, 391 (Tenn. 1983) ("We align ourselves with those jurisdictions that require the transfer of title to a trustee for the benefit of the trust of an identifiable res, as the event that brings a trust into existence." (footnote and citations omitted)).

Moreover, other courts have determined that indemnity agreement provisions similar to the "trust fund" provision in the GAI have impressed an express trust on bonded contract proceeds received by the contractor. *Favre v. Lyndon Prop. Ins. Co.*, No. 1:07cv1261HSO-JMR, 2008 WL 3271100, at *4 (S.D. Miss. Aug. 6, 2008) (finding that "[b]oth the bonds and the Indemnity Agreement created an express trust for the construction contract funds" (footnote omitted)); *In re Hastings*, 438 B.R. 743, 743–45 (Bankr. N.D. Ala. 2008) (finding that indemnity agreement created an express trust); *In re McCormick*, 283 B.R. 680, 683–84 (Bankr. W.D. Pa. 2002) (same); *In re Wright*, 266 B.R. 848, 851 (Bankr. E.D. Ark. 2001) (same). For example, in *In re Poynter*, 535 F. App'x 479 (6th Cir. 2013), the Sixth Circuit determined, utilizing Kentucky law, that an indemnity agreement between a construction company and a surety created an express trust. The contractor relied upon *Acuity* to argue that the agreement did not create an

12

express trust, but the Sixth Circuit distinguished *Acuity*, finding that the surety "had a definite pecuniary and legal interest, at the time the agreement was signed, in the amount that it was agreeing to insure [the contractor]." *Id.* at 483. "Although there was a time lapse, [the contractor] . . . signed the [agreement] in consideration of [the surety's] issuance of the payment and performance bonds. When the first contract was received, a payment and performance bond was issued by [the surety] to [the contractor]." *Id.* Thus, the Sixth Circuit said, "We believe the issuance of the bonds and the acceptance of the bonds by [the contractor] is sufficient to create a continuing obligation to abide by the trust provision in the [indemnity agreement]." *Id.* (citation omitted).

First Tennessee argues that *In re Poynter* and other bankruptcy cases are inapposite because "they all involve the assertion of a breach of trust by the surety against a bankrupt contractor in order to establish a defalcation in a fiduciary capacity in non-dischargeability litigation under 11 U.S.C. § 523(a)(4)" [Doc. 14 p. 16]. In support, First Tennessee relies upon the following statement in *In re Poynter*:

> Poynter relies heavily on *Acuity* to support his argument. The court's issue in *Acuity*, however, was a subrogation rights dispute between a surety and a creditor bank. *Id.* at 888. Our issue whether a sufficient fiduciary relationship existed under 11 U.S.C. § 523(a)(4) such that the debt was non-dischargeable is entirely different.

*Id.* at 483. But the Sixth Circuit went on to state, "*Acuity* is not irrelevant because it explains" Kentucky trust law. *Id.* Thus, the Court finds that bankruptcy cases addressing whether an indemnity agreement gives rise to an express trust are not irrelevant in addressing First Tennessee's motion to dismiss. *Accord In re Eastern Paving Co.*, 293

13

B.R. 704, 708 (Bankruptcy E.D. Mich. 2003) (noting that although the many Sixth Circuit cases "addressing whether or not an express trust exists and whether the alleged trust res is property of a bankruptcy estate . . . reach differing conclusions, the starting point in each of them is an examination of state law and whether the facts in such case evidence the existence of an enforceable trust under the laws of that particular state"). Moreover, First Tennessee itself cites bankruptcy cases to support its argument that the GAI does not give rise to an express trust. Specifically, First Tennessee asserts, "The bare assertion of a trust under language contained in a surety's indemnity agreement has been determined by the Sixth Circuit Court of Appeals to be insufficient to establish such a trust fund, in the case of *In re: Construction Alternatives, Inc.*, 2 F.3d 670 (6th Cir., 1993)," and First Tennessee cites additional bankruptcy cases in support of this position [Doc. 14 p. 16 (emphasis omitted)].[3] But the Court finds these cases, and particularly *In re Construction Alternatives*, distinguishable.

In *In re Construction Alternatives*, the Sixth Circuit did not hold that "[t]he bare assertion of a trust" in an indemnity agreement is insufficient to establish a trust; instead, the Sixth Circuit determined that the language in the indemnity agreement at issue did not create a trust because it did not require the contractor to keep a separate trust fund, as required by Ohio law. 2 F.3d at 677 (citing *Federal Ins. Co. v. Fifth Third Bank*, 867

---

[3] These citations include *Ohio Farmers Ins. Co. v. Hughes-Bechtol, Inc.*, Nos. 98-4257, 98-4309, 2000 U.S. App. LEXIS 18741 (6th. Cir. July 27, 2000) (addressing boilerplate language in state contract), and *In re Eastern Concrete Paving Co.*, 293 B.R. at 708–09 (finding the indemnity agreement did not satisfy the requirements of Michigan trust law) [Doc. 14 p. 16].

F.2d 330, 333 (6th Cir. 1989)). Contrary to First Tennessee's assertions, Tennessee law does not require segregation of trust funds. *See In re Appalachian Oil Co.*, 471 B.R. at 208 (applying Tennessee law and stating, "[t]he fact [the putative trustee] failed to segregate the TEL trust funds and commingled them with its own funds does not destroy the previously established trust or the parties' fiduciary relationship").[4]

Accordingly, the Court finds that the GAI creates an express trust upon bonded contract proceeds, and because of this finding, the Court finds that Selective has properly alleged itself as the true owner of the property at issue. But this determination does not end the inquiry of whether Selective has stated a claim for conversion. First Tennessee argues that it did not defy Selective's rights because paragraph 11 of the GAI subordinates Selective's interest in the bonded contract proceeds to First Tennessee's purported security interest.

In paragraph 11 of the GAI, Selective and the Indemnitors agreed that the Indemnitors must obtain the express written consent of Selective before assigning their rights to receive payments from the bonded contracts, but they excepted from this requirement the assignment of the Indemnitors' rights to these payments as collateral [Doc. 7-1]. The parties further agreed that any assignment of the right to receive

---

[4] To the extent that First Tennessee relies upon *Kimball v. Parks*, 268 S.W. 117 (Tenn. 1925), to assert that segregation was required, the Court finds *Kimball* inapposite. *Kimball* does not address whether an express trust may arise from an indemnity agreement or whether segregation of funds is necessary to preserve the trust impressed upon them.

15

payments from the bonded contracts "shall not operate to discharge, diminish or lessen [the Indemnitors'] obligations to [Selective]" under the GAI [*Id.*].

Selective argues that this language indicates that, to the extent ESH assigned its interest in the bonded contract proceeds as collateral, that interest would not attach until the purpose of the trust was satisfied. Until that time, Selective asserts, ESH possessed legal title to any bonded contract proceeds, while the beneficiaries of the trust possessed equitable title. First Tennessee argues that reading paragraph 11 in this way ignores the plain language of the GAI that allows the Indemnitors to assign collateral rights to the bonded contract payments.[5]

The Court does not find that reading paragraph 11 in accord with Selective ignores the plain language of the GAI that allows the Indemnitors to assign collateral rights because, under Tennessee law, a trustee "holds legal title and in that sense, owns the property, holding it for the benefit of the beneficiary who owns the equitable title." *Myers*, 891 S.W.2d at 219. Thus, because the Court has found that the GAI creates an express trust and one may infer from the allegations of the amended complaint that the purpose of the trust had not been satisfied, it follows that ESH held only legal title to the bonded contract proceeds. *See In re Marrs-Winn Co.*, 103 F.3d 584, 589–93 (7th Cir. 1996) (holding that a bank's priority security interest did not apply funds in trust because assignor only possessed bare legal title); *Fed. Ins. Co. v. Fifth Third Bank*, 867 F.2d 330

---

[5] To the extent First Tennessee asserts that this language creates a secret lien, the Court finds the argument unconvincing, as it does so without citing any support.

(6th Cir. 1989) (holding that, because progress payments to contractor were trust funds pursuant to construction agreement with state, the contractor's lender could not offset the payments against the debt the contractor owed the lender).

First Tennessee also argues that the complaint fails to allege that First Tennessee had knowledge of the nature of the bonded contract proceeds. Tennessee law precludes a bank from exercising its setoff rights or otherwise exercising control over funds in a customer's account when the bank knows that the customer holds the funds in trust or the bank knows that the funds were deposited for a specific purpose. *Wagner v. Citizens' Bank & Trust Co.*, 122 S.W. 245 (Tenn. 1909); *In re Prop. Leasing & Mgmt., Inc.*, 46 B.R. 903, 908 (Bankr. E.D. Tenn. 1985); *see also Acuity*, 362 F. Supp. 2d at 889–90 (noting that a "bank may not apply a deposit, consisting of trust funds or funds belonging to one other than the depositor, to the individual indebtedness of the depositor if 'it knows, or can properly be charged with knowledge of, the trust character or true ownership of the funds'" (citation omitted)). Yet, First Tennessee's argument concerning knowledge was raised for the first time in its reply brief. "A movant cannot raise new issues in a reply brief 'because such a practice denies the non-moving party a meaningful opportunity to respond.'" *Miller v. Experian Information Solutions, Inc.*, No. 3:13-cv-90, 2014 WL 5513477, at *1 (S.D. Ohio Oct. 31, 2014) (citation omitted); *see also Cooper v. Shelby Cnty., Tenn.*, No. 07-2283-STA-cgc, 2010 WL 3211677, at *3 n.14 (W.D. Tenn. Aug. 10, 2010) (collecting Sixth Circuit and district court cases discussing this principle). The Court therefore declines to consider First Tennessee's argument that the complaint

17

fails to allege the bank's knowledge of the nature of the bonded contract proceeds.[6] For the same reason, the Court declines to consider First Tennessee's argument that the Court must dismiss the conversion claim because the complaint does not meet the pleading standards for a claim of conversion of money under Tennessee law.

In sum, for all these reasons, the Court finds that Selective has alleged a claim for conversion under Tennessee law. The Court will therefore deny First Tennessee's motion to dismiss. *Accord Am. Bank, FSB v. Cornerstone Cmty. Bank*, 903 F. Supp. 2d 568 (E.D. Tenn. 2012) (noting that "a bank exercises dominion and control over funds when it applies funds to existing debt" (citations omitted)), *affirmed by* 733 F.3d 609, 614–15 (6th Cir. 2013).

## III. Selective's Motion for Preliminary Injunction [Doc. 12]

Rule 65 of the Federal Rules of Civil Procedure permits a party to seek injunctive relief if he believes he will suffer irreparable harm or injury during the pendency of the action. Fed. R. Civ. P. 65. A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).

In determining whether to grant a plaintiff's request for injunctive relief, the Court must consider four factors: (1) whether the movant would suffer irreparable harm without the injunction; (2) whether issuance of the injunction would cause substantial harm to others; (3) whether the public interest would be served by the issuance of the injunction;

---

[6] Even so, the Court notes that the complaint alleges, upon information and belief, that First Tennessee had knowledge that funds used to pay debts to the bank were proceeds of bonded contracts and/or that ESH held those funds in trust.

18

and (4) whether the movant has demonstrated a strong likelihood of success on the merits. *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc); *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted).

Here, the only objection to the entry of a preliminary injunction comes from First Tennessee. First Tennessee argues that entry of the injunction will interfere with its rights to the interest in all of the inventory, accounts, equipment, and general intangibles of ESH, including all contract payments. First Tennessee's arguments in this regard mirror the arguments the Court has rejected in consideration of First Tennessee's motion to dismiss.

In the proposed agreed order submitted by Selective and the Indemnitors, the Indemnitors are to:

(1) cause all funds or the proceeds of all consideration received or to be received in relation to Contract Number W912P5-09-D-0009-0005 between ESH and the United States, acting through the Department of the Army, Nashville District, Corps of Engineers, to be deposited into the Account with Bancorp Group entitled "Dayhill Group, LLC FBO Environmental Safety & Health, Inc. Center Hill Powerhouse Project," and such funds will be controlled by Dayhill Group, LLC, the escrow agent Selective has designated;

(2) cause all funds or the proceeds of all consideration received or to be received in relation to all other contracts covered by the Bonds Selective issued on behalf of ESH to be paid directly to Selective;

(3) provide Selective continuous and uninterrupted access to their books, records, accounts, etc. concerning the bonds Selective issued and the financial condition, credit worthiness, and assets of the Indemnitors;

19

(4) grant to Selective, and take all actions necessary to allow Selective to perfect, a security interest in the following assets:

    a. the real property and all improvements/fixtures located at 112 Whippet Lane, Clinton, TN 37716;

    b. the real property and all improvements/fixtures located at 125 Whippet Lane, Clinton, TN 37716;

    c. the real property and all improvements/fixtures located at 199 Lost Ridge Road, Clinton, TN 37716;

    d. the real property and all improvements/fixtures located at 940 Sanctuary Lane, Knoxville, TN 37932;

    e. the real property and all improvements/fixtures located at Lot 20-R of Lost Ridge Views Subdivision in Anderson County, Tennessee;

    f. the real property and all improvements/fixtures located at Lot 21-R of Lost Ridge Views Subdivision in Anderson County, Tennessee;

    g. any other real property, improvements, and/or fixtures owned by the Indemnitors and any interest any of the Indemnitors may possess in any other corporation, limited liability company, or similar entity that owns real property, improvements, and/or fixtures; and

    h. the life insurance policy Garibay obtained from American General Life and Accident in the face amount of $1,250,000; and

(5) refrain from transferring, encumbering, or otherwise disposing of, concealing or secreting any of their property or assets, real, personal and mixed, whether jointly or solely owned, that might serve as collateral to secure Selective from liability herein until proof satisfactory to the court is presented to establish that all claims to which Selective is exposed have been liquidated and discharged provided, however, the Indemnitors may pay bills and invoices that become due in the ordinary course of business after providing Selective five (5) days notice prior to the payment (which notice may be given by email to Selective's counsel) so long as Selective does not object to the payment.

Upon consideration of this proposal, the likelihood of success on the merits, the potential harm to others, the public interest, and likelihood of irreparable harm [*See* Doc. 12-1], the Court finds the motion well taken and will enter the proposed agreed order.

Even so, First Tennessee argues that, should the Court grant the motion for injunctive relief, Selective should provide security in an amount that the Court considers proper to pay the cost in damages sustained by First Tennessee to the extent it is wrongfully enjoined or restrained from asserting its superior rights to the payment proceeds that comprise its collateral. It appears that Selective has not addressed this assertion.

While the Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," Fed. R. Civ. P. 65(c), "the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security," *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Because the Court has found First Tennessee's motion to dismiss without merit, the Court declines to exercise its discretion to require Selective to post security.

## IV.    Conclusion

For the reasons discussed herein, the Court **DENIES** First Tennessee's motion to dismiss [Doc. 13] and **GRANTS** the motion for injunctive relief [Doc. 12]. The Court

21

will enter the proposed agreed order contemporaneously with this memorandum opinion and order.

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE